# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

January 22, 1999

Cecil W. Crowson
Appellate Court Clerk

IN THE MATTER OF THE )
CONSERVATORSHIP OF )
EDWARD LEO GRAY, )
 )
EDWARD LEO GRAY, )     Appeal No.
 )     01-A-01-9802-CH-00061
      Respondent/Appellant, )
 )     Robertson Chancery
 )     No.  13271
VS. )
 )
SUSAN POLEN ZIMMERLE, )
 )
      Petitioner/Appellee. )


APPEALED FROM THE CHANCERY COURT OF ROBERTSON COUNTY
AT SPRINGFIELD, TENNESSEE

THE HONORABLE CAROL A. CATALANO, CHANCELLOR


ANGUS GILLIS, III
SCHULMAN, LEROY & BENNETT, P.C.
7th Floor, 501 Union Building
Nashville, TN 37219-0676
      Attorney for Respondent/Appellant

LISA M. SHERRILL
LAW OFFICES OF LARRY D. WILKS
509 West Court Square
Springfield, Tennessee 37172
      Attorney for Petitioner/Appellee


AFFIRMED IN PART; REVERSED IN PART;
AND REMANDED


BEN H. CANTRELL,
PRESIDING JUDGE, M.S.

CONCUR:
KOCH, J.
CAIN, J.


# O P I N I O N

The trial court appointed a conservator to oversee the financial affairs of an elderly retired man who had suffered two strokes. We reverse the trial court because we do not believe the need for a conservator was proven by clear and convincing evidence.

## I. Old Age and Physical Decline

Edward Leo Gray suffered his first stroke in 1992, when he was seventy-eight years old and living in Mississippi. His wife of fifty-six years died two years later. Mr. Gray then bought a home in Greenbrier, Tennessee to be close to his daughter, the appellee Susan Zimmerle. He suffered a second stroke in August of 1996, and was admitted to Nashville Memorial Hospital.

Mr. Gray stayed in the hospital ten days, and was then transferred to the Rehabilitation Unit at Tennessee Christian Medical Center. Though he apparently made progress there, the stroke left him with impaired vision and hearing, and an unsteady gait. Mr. Gray was discharged from rehabilitation after two weeks, with prescriptions for a number of medications and a strong recommendation that he obtain physical help at home.

He was not happy with the helpers that were sent to him, and he cancelled their services after three weeks, leaving Ms. Zimmerle to take up much of the slack. While working as a schoolteacher, she also cleaned her father's house, did his laundry, and prepared food for him, as the two of them struggled with the difficulties of maintaining his independent lifestyle in the face of his infirmities. In March of 1997, he reluctantly agreed to enter the Maybelle Carter Home, an assisted living facility.

Mr. Gray stayed at Maybelle Carter only eleven days. He complained about the food, was not compliant with the medication regimen, and he was unhappy about being unable to watch the financial news there, because the other residents preferred soap operas. He returned home, but continued to do poorly there, losing weight and not maintaining personal hygiene.

Ms. Zimmerle consulted with an attorney, and had a conservatorship petition drawn up. The event that precipitated the filing of the petition occurred on June 4, 1997, when Mr. Gray set out for the Farmers and Merchants Bank on Highway 41 in Greenbrier with the purpose of cashing in $150,000 worth of CDs, to obtain funds to invest in Compaq Corporation and Dell Computer. During the course of a long career with the Tennessee Valley Authority, Mr. Gray had shrewdly invested his money, and had accumulated assets of over $800,000.

Mr. Gray drove to the bank on his three wheeled electric scooter, and asked for the funds. He had previously told the manager that his stroke had left him legally blind, and she was aware that he had driven the scooter to the bank. She was alarmed because of this, and because of his disheveled appearance, and she called the police and Ms. Zimmerle. After Ms. Zimmerle arrived, the police officer took Mr. Gray to Tennessee Christian Medical Center, where a psychologist, Dr. Jeffrey Bryant, filled out a certificate for involuntary admission. *See* Tenn. Code Ann. § 33-6-103(c).

After admission, Mr. Gray underwent a mental status examination performed by Dr. James Roberson, a psychiatrist. Dr. Roberson found Mr. Gray to be "alert and oriented in all spheres," that he was not delusional, that his fund of knowledge was excellent, and that his ability to perform serial subtractions was intact. Dr. Bryant administered a battery of psychological tests which indicated no gross impairment and no diagnosable dementia. Mr. Gray's memory and ability to concentrate were found to be within the average range for individuals of his age. Dr.

Bryant recommended that he be released as long as he had a sitter with him eight hours a day. Mr. Gray was discharged after a probable cause hearing, twelve days after being admitted to the Medical Center. A short time afterward, he moved to Atlanta to live with his oldest son.

## II. Conservatorship Proceedings

On the day after the incident at the bank, Susan Zimmerle filed her petition to be appointed as Conservator for the benefit of her father.[1] Attached to the petition was a sworn report by Dr. Stephen White, an internist who had examined Mr. Gray within ninety days of the filing. *See* Tenn. Code Ann. § 34-13-105(c). Dr. White recommended that a conservator be appointed for Mr. Gray, with broad powers over his medical care, financial affairs, and living situation. The trial court promptly appointed a Guardian ad Litem for Mr. Gray.

The Guardian ad Litem visited with Mr. Gray while he was still at the hospital. He spoke to the doctors, to all three of Mr. Gray's children, and to others who had interacted with Mr. Gray. He also participated in five depositions, and spoke to Mr. Gray by telephone on September 2, 1997. His report, filed on September 22, 1997, contained much of the same background information as has been stated above. While finding that Mr. Gray could not adequately take care of his physical needs without assistance, the Guardian did not specifically recommend the appointment of a conservator, but stated:

> "Mr. Gray is certainly not insane. He talked to me as a normal person, and he seems to have been doing better now than he has at some times in the last year. This may be contributable (sic) to the fact that he is cooperating well with his son.

---

[1]Ms. Zimmerle amended her Petition on September 12, 1997, requesting that she be appointed conservator of her father's person, and that some "non-related, neutral, bonded party with financial experience" be appointed as conservator over financial matters.

The Guardian ad Litem added:

> "There have been allegations of mishandling of Mr. Gray's funds. This was done during times when Mr. Gray was supposedly in full control of his abilities, according to Mr. Startup, Mr. Gray's longtime friend and banker. It seems that a bank or someone other than the children might be better to handle his property if the court determines that he needs help in this regard.

Hearings on the petition took place on September 25 and December 11, 1997. Mr. Gray testified at length during the December 11 proceedings. He was able to summarize his educational, family, medical and employment experience, and to discuss his financial holdings in great detail. When questioned about the incident at the Farmers and Merchants Bank, he stated that he had asked Ms. Zimmerle to take him to the bank several times, and that she had refused because she didn't want him to cash in the CDs.[2] He was also aware that there was no taxi service in Greenbrier. He therefore decided to take the scooter, but used the back roads to get to the bank, and was only briefly on the shoulder of Highway 41.

He also stated that he had been doing much better physically and mentally since moving in with his son (which was confirmed by testimony of the son, the son's wife, his other daughter and others), and that he did not wish to have a conservator appointed.

On December 30, 1997 the trial court filed its Findings of Fact and Judgment of the Court. The document summarized the evidence presented, and concluded:

> All these facts considered the Court concludes that Respondent is mentally competent to handle his own business affairs but that he is physically disabled to the extent that he cannot logistically and practically accomplish the reading, writing, listening/hearing, transporting of himself, gathering, organizing and transacting the business that his various financial holdings requires.

---

[2]At the hearing, Ms. Zimmerle denied that her father had ever made this request, or that she would have refused if he had asked her.

Therefore the Court appoints the Union Planter's National Bank, conservator of the property of the Respondent ...

The Court also ordered that the costs of the proceedings, including the fee of the guardian ad litem, the court costs, and the attorney fees incurred by the petitioner, be charged against the property of Mr. Gray, pursuant to Tenn. Code Ann. § 34-11-114.  This appeal followed.

### III.  Mr. Gray's Mental Status

The appellant argues that the trial court erred in concluding that Mr. Gray needed a conservator to manage his financial affairs.  The appellee argues to the contrary that the trial court's order did not go far enough, and that it should also have appointed a conservator for his person, because Mr. Gray was unable to care for himself, and did not possess the judgment necessary to preserve his health and safety.

We must state at the outset that it is apparent from the record that because of his physical condition, Mr. Gray cannot take care of himself without assistance.  But it is not so apparent that this assistance must come in the form of a conservator to make decisions for him.  The appellee points to  some apparently isolated incidents of forgetfulness and hostility as evidence of Mr. Gray's incompetence.  More significantly she cites his decision to discharge the home health aides sent by Tennessee Christian Medical Center, his refusal to take his medication at the Maybelle Carter Home, and his decision to drive his scooter to the bank, as evidence that his judgment was fundamentally flawed, rendering him a danger to his own survival.

We believe, however, that these incidents demonstrate the difficulty of Mr. Gray's situation.  He found himself between a rock and a hard place, and the

decisions he made, however unwise, resulted from the lack of better alternatives, not from some fundamental deficiency in his mental processes.

Mr. Gray discharged his home health aides because he felt that they didn't do very much except sit around and watch television, didn't coordinate their visits with each other, and that when they did help him, they were unwilling to do things in the way he wanted. To a man like Mr. Gray, accustomed to being independent all his life, it had to be galling to have strangers in his home to meet his needs. When, in his estimation they failed to meet those needs, it is not surprising that he decided to do without them.

Mr. Gray refused his medications at the Maybelle Carter Home because he thought one of them was causing his diarrhea. Several of the medical experts testified that diarrhea is a common side-effect of Colchicine, an anti-gout medication that had been prescribed for Mr. Gray. If Dr. White, who prescribed the Colchicine, had informed him of this fact, we believe that Mr. Gray would not have taken the dangerous step of refusing all medications.

Mr. Gray accused the staff at Maybelle Carter of trying to poison him by serving him rotten bologna. He later toned down this accusation, and said that the food was tainted. Regardless of the accuracy of his evaluation of the food, we do not believe that his statement shows him to be suffering from paranoid delusions, as the appellee implies. The court noted that like many elderly people, Mr. Gray is not afraid to say what he feels. We believe he exaggerated his complaints about the food to express his general discontent with assisted living. Similarly, we do not take statements that he wanted to kill himself, which he made from time to time, as presenting a danger of suicide, but as a sign of depression, and a bid for attention.

Mr. Gray had a right to leave the assisted living facility when he found that the lifestyle was not to his liking. We note, however, that shortly after leaving, he called his daughter to tell her he was thinking of returning to Maybelle Carter, because he was afraid that he might be placing an intolerable burden upon her. Mr. Gray and Ms. Zimmerle met with administrators at Maybelle Carter to discuss his possible return, but the institution was unable to make changes in its procedures to accommodate his needs.

Finally, we do agree that it was dangerous for Mr. Gray to drive his scooter to the Farmers and Merchants Bank on June 4, 1996. However, we do not believe his decision to be so irrational as to call his competence into question. Like many investors, he was afraid to miss out on a booming market in computer stocks; he felt he had no other way to get to the bank; and he took the safest route he knew.

### IV. Medical Evidence and the Conservatorship Statutes

The parties both rely upon expert testimony by medical doctors, psychiatrists and psychologists. While Dr. White and Dr. Bryant both testified in their depositions that Mr. Gray was in need of a conservator, the deposition of Dr. Kirby Pate, a geriatric psychiatrist who also examined Mr. Gray, was to the contrary. Interestingly, the clinical findings of these three doctors and of Dr. Roberson were all consistent with each other.

All the experts (and the Guardian ad Litem) agreed that Mr. Gray was substantially in possession of his reasoning faculties, but was physically impaired as a result of his stroke. Drs. Bryant[3] and White both expressed concerns about his

---

[3] While they questioned Mr. Gray directly, both Dr. Bryant and Dr. White relied upon information supplied by Ms. Zimmerle. Dr. Bryant apparently believed that Mr. Gray had barricaded himself in the Farmers and Merchants Bank. Such an account of the incident at the bank is directly contradicted by the testimony of William Hatfield, the police officer who escorted Mr. Gray to Tennessee Christian Medical Center.

judgment, and the consequences that errors in judgment might have upon his safety. They also expressed concerns about the future, in view of the likelihood that Mr. Gray's condition would worsen over time.

It appears to us that while the trial court's order attempted to address these concerns, the remedy it applied exceeded the mandate of the conservatorship statutes. The court correctly found that as of the date of the hearing, Mr. Gray was mentally competent. It also found that he was quite knowledgeable about financial matters, and mentally capable of handling his own business affairs. But it nonetheless appointed a conservator for him, on the ground that his physical limitations rendered him incapable of conducting the business that his financial holdings required.

We do not believe that the evidence supports this conclusion. We note that after the sale of his home in Greenbrier, the management of Mr. Gray's assets will not require travel or a great deal of physical capacity. Almost all transactions can be handled by telephone. Though Mr. Gray's hearing is diminished, there is evidence in the record that he could hear well enough to carry on a conversation over the phone. His vision is poor, but he can read the stock market reports by using a lighted magnifying glass, and he follows the market avidly by watching financial shows on television.

No doubt the court was concerned that Mr. Gray's absorption in his financial affairs would lead to a possible repetition of an incident like the one at the Farmers and Merchants Bank, but with worse consequences for him. The court was aware that if he had to have a financial conservator appointed, he would prefer it to be Union Planters Bank, and this was the choice the court made. However Mr. Gray has chosen to appeal the court's decision, and we believe he is entitled to have that decision reversed.

Tenn. Code Ann. § 34-11-126 states that "[t]he court must find by clear and convincing evidence that the respondent is fully or partially disabled and that the respondent is in need of assistance from the court before a fiduciary can be appointed." Further, Tenn. Code Ann. § 34-11-127 tells us that "[t]he court has an affirmative duty to ascertain and impose the least restrictive alternatives upon the disabled person which are consistent with adequate protection of the disabled person and the disabled person's property."

We do not believe that the Petitioner has proven by clear and convincing evidence that Mr. Gray was in need of a fiduciary at the time the court rendered judgment. Thus, under the circumstances of this case, the least restrictive alternative was to allow him to manage his own financial affairs.

We are aware that Mr. Gray's condition may have changed for the worse since the hearing, but the law does not authorize the appointment of a conservator on the ground of prospective disability. We accordingly reverse the judgment of the trial court and order that the conservatorship be dissolved. We also reverse the award of attorney's fees to Ms. Zimmerle's attorney. The fee of the guardian ad litem and the court costs below will be paid out of the property of Mr. Gray.

**V.**

The judgment of the trial court is reversed. Remand this cause to the Chancery Court of Robertson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellee.

_____
BEN H. CANTRELL,

                                        PRESIDING JUDGE, M.S.


CONCUR:


_____
WILLIAM C. KOCH, JR., JUDGE


_____
WILLIAM B. CAIN, JUDGE